IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANLOGIC SCOUT DEVELOPMENT, LLC, et al., <br><br> Petitioners, <br><br> v. <br><br> SCOTT HOLDINGS, INC., <br><br> Respondent. | CIVIL ACTION <br> NO. 16-5042 |

## OPINION

**Slomsky, J.**                                                                 July 12, 2017

## I.   INTRODUCTION

Before the Court is a Petition to Compel Arbitration filed by Franlogic Scout Development, LLC, Ed Samane, Lisa Kornstein, Howard Soloway, and Steve Pruitt ("Petitioners") (Doc. No. 1). Respondent Scott Holdings, Inc. has filed a Motion to Dismiss this Petition (Doc. No. 2). For the following reasons, the Court will grant the Motion to Dismiss (Doc. No. 2) and will deny the Petition to Compel Arbitration (Doc. No. 1).

## II.   BACKGROUND

In 2015, Brian and Jacqueline Scott formed a corporation named Scott Holdings, Inc. ("Scott Holdings") to open retail stores in San Francisco, California. (Doc. No. 1 at ¶ 15.) On July 30, 2015, Scott Holdings entered into two agreements with Franlogic Scout Development, LLC ("Franlogic") to purchase and operate a franchise named "Scout and Molly's," which would sell women's clothing and accessories. (Id. at ¶¶ 10, 16, 18.) The two agreements are: (1) an Area Development Agreement ("ADA"), and (2) a Franchise Agreement ("FA"). (Id. at ¶¶ 16-18.)

1

The ADA established the franchisor-franchisee relationship between Franlogic and Scott Holdings. (Doc. No. 14 at 4.) In particular, the ADA gave Scott Holdings the "right to develop and establish" two stores within a designated marketing area in San Francisco, California. (Doc. No. 2-2 at ¶ 1.) The ADA required Scott Holdings to pay Franlogic a development fee and to "open[] and commence[] operations of such Stores in strict accordance with the mandatory development schedule." (Id. at ¶¶ 1-2.) The ADA also mandated that Scott Holdings enter into a contemporaneous Franchise Agreement ("FA") for the first store. (Id. at ¶ 3.) To this end, the ADA provides: "Contemporaneous with the execution of this [Area Development] Agreement, [Scott Holdings] must enter into Franchisor's current form of Franchise Agreement for the first Store that [Scott Holdings] is required to open within the Designated Marketing Area." (Id.) The ADA further provides:

> 4. Additional Franchise Agreements. Developer agrees and acknowledges that it must: (i) enter into Franchisor's then-current form of Franchise Agreement for each additional Store that Developer is required to open under this Agreement; and (ii) enter into such Franchise Agreements at such times that are required for Developer to timely meet, and strictly adhere to, its obligations under the Development Schedule.

(Id. at ¶ 4.) Under this provision, the ADA required that the parties enter into a separate Franchise Agreement for each additional store that Scott Holdings opened. (Id.) In accordance with the terms of the ADA, the parties entered into a Franchise Agreement ("FA") for the opening of the first store. (Doc. No. 1-1.)

Under the FA, Scott Holdings obtained the right to license the Scout and Molly's proprietary system in order to open one retail store. (Id. at ¶ 1.) The FA provides in relevant part:

> 1. Grant. Franchisor hereby grants to Franchisee, on the terms and conditions contained in this Agreement, and Franchisee accepts from Franchisor, a license to establish, own, and operate under the System, one brick and mortar

2

retail store ("Store") at the location specified either on Exhibit A ("Location") or in the Site Selection Addendum attached hereto as Exhibit B ("Site Selection Addendum"), and the right to use Franchisor's Marks and other intellectual property and proprietary information and products owned by Franchisor. Franchisee agrees to identify the Store and all of the items Franchisee sells or offers for sale only by the Marks. Franchisee has no right to use the System or the Marks for any purpose other than expressly provided herein.

(Id.) Scott Holdings paid a $50,000 franchise fee to Franlogic, and also agreed to pay royalties to Franlogic from revenue generated by the store. (Id. at ¶ 3.) In addition, the FA required Scott Holdings to find a location to open the first Scout and Molly's store within 120 days of the execution of the FA. (Id.)

Under the ADA and FA, disputes between the parties are handled differently. Although the ADA contains dispute resolution provisions, it does not have an arbitration clause. (See Doc. No. 2-1 at ¶¶ 12-13.) The FA contains an arbitration clause. (Doc. No. 1-1 at ¶ 21(a).) The ADA states as follows:

> 12. Internal Dispute Resolution. Developer must first bring any claim or dispute between Developer and Franchisor to Franchisor's President and Chief Executive Officer, after providing Franchisor with notice of and a reasonable opportunity to cure and alleged breach hereunder. Developer must exhaust this internal dispute resolution procedure before bringing a dispute before a third party. This agreement to first attempt resolution of disputes internally will survive termination or expiration of this Agreement.
>
> 13. Mediation. At Franchisor's option, all claims or disputes between Franchisor and Developer or its affiliates arising out of, or in any way relating to, this Agreement or any other agreement by and between Franchisor and Developer or its affiliates, or any of the parties' respective rights and obligations arising from such agreement, which are not first resolved through the internal dispute resolution procedure sent forth in Section 12 above, must be submitted first to mediation, in Philadelphia, Pennsylvania under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Developer must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute. Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify Developer as to whether Franchisor or its affiliates elects to exercise its option to submit such

3

claim or dispute to mediation. Developer may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor. Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. This agreement to mediate will survive any termination or expiration of this Agreement. The parties agree that there will be no class action mediation.

(Doc. No. 2-2 at ¶¶ 12-13.) Conversely, the FA provides:

21. <u>Governing law; Jurisdiction and Venue</u>.

(a) <u>Dispute Resolution</u>.

(i) Franchisee and Franchisor acknowledge and agree, subject to Section 2l(b), that in the event a dispute between the parties is not resolved informally, an officer of Franchisor and the principal(s) of Franchisee must first meet in King of Prussia, Pennsylvania at the offices of Franchisor or such other place designated by Franchisor to discuss a resolution.

(ii) In the event the dispute resolution procedures described in Section 21(a)(i)[]result in a settlement between the parties, Franchisor and Franchisee agree that any action arising out of or relating to this Agreement or the making, performance, or interpretation thereof shall upon thirty (30) days written notice by either party be resolved, except as elsewhere expressly provided in this Agreement, upon application by any such party by binding arbitration in Philadelphia, Pennsylvania, in accordance with the Federal Arbitration Act under the Commercial Arbitration Rules then prevailing of the American Arbitration Association, including without limitation the Optional Rules for Emergency Measures of Protection ("AAA"), and not under any state arbitration laws, and judgment on the arbitration award may be entered in any court of competent jurisdiction. Franchisee acknowledges that it has and will continue to develop a substantial and continuing relationship with Franchisor at its principal offices in the Commonwealth of Pennsylvania, where Franchisor's decision-making authority is vested, franchise operations are conducted and supervised, and where Agreement was rendered binding. Franchisee and Franchisor agree that arbitration shall be conducted on an individual - not a classwide basis. The Federal Arbitration Act shall apply to all arbitration and arbitration venue questions. Any award by the arbitrator(s) shall be final, binding and non-appealable, except for errors of law. Unless the parties agree in writing at

> the time an arbitration proceeding is commenced to have a single arbitrator, the matter shall be heard by three (3) arbitrators, with each party selecting one (1) arbitrator and the third (3) arbitrator to be selected by the AAA. The arbitrator selected by the AAA shall have at least ten (10) years' experience in practicing franchise law, during which franchise law is or has been their primary area of practice and shall have substantial experience in the preparation of franchise agreements and franchise disclosure documents. Franchisee understands that by agreeing to arbitrate it gives up jury and appeal and other rights it might have in court.
>
> (iii) Matters involving the Marks or any other proprietary property, any lease or sublease of real property, Franchisee's obligations upon termination or expiration of your Franchise Agreement, any Transfers, and matters involving danger or public safety may be immediately handled through litigation in Montgomery County Court of Common Pleas, in the Commonwealth of Pennsylvania, or the U.S. District Court for the Eastern District of Pennsylvania, at the sole discretion of Franchisor

(Doc. No. 1-1 at ¶ 21(a).) Although the two contracts include different dispute resolution provisions, the ADA controls when a conflict arises. In fact, the ADA expressly states that its terms will control in the event of a conflict between the two agreements. (Doc. No. 2-1 at ¶ 27.) The ADA states in pertinent part:

> In the event of a conflict between this [Area Development] Agreement and any Franchise Agreement(s), the terms, conditions and intent of this [Area Development] Agreement will control.

(Id.) As such, in the event of any conflict between the ADA and the FA, the terms of the ADA will govern.

Shortly after purchasing the franchise, Scott Holdings began having problems with opening the Scout and Molly's stores. (See Doc. No. 1-3.) The Scotts felt that Franlogic and its officers made false and misleading representations during their negotiations, underestimating the total cost to set up the stores and miscalculating the amount of time the Scotts would need to spend managing the operation. (Id.)

5

On July 26, 2016, Scott Holdings initiated an action against Franlogic in California Superior Court seeking a rescission of the ADA. (See id.) In particular, Scott Holdings alleges that Petitioners violated provisions of the California Franchise Investment Law, engaged in false advertising, and committed unfair trade practices when negotiating with the Scotts to enter into the ADA. (Doc. No. 2-6 at ¶¶ 32-37, 49-64.) Scott Holdings alleges that Petitioners made material misrepresentations and induced the Scotts to enter into the ADA, without a full disclosure of the obligations the Scotts would encumber. (Id. at ¶¶ 14-15.) Significantly, Scott Holdings does not seek relief under the FA in California. (Id.) On September 16, 2016, Franlogic filed a Notice of Removal, removing the California case from California Superior Court to the United States District Court for the Northern District of California. (Doc. No. 2-6.) On October 7, 2016, Franlogic filed its Answer to the Complaint in federal court in California. (Doc. No. 2-1 at 5.) That case is currently being litigated there. (Id.)

Months later, on September 21, 2016, Petitioners Franlogic Scout Development, LLC, Ed Samane, Lisa Kornstein, Howard Soloway, and Steve Pruitt initiated the action before this Court by filing a Petition to Compel Arbitration. (Doc. No. 1.) Petitioners did not file a motion to compel arbitration in California.[1] Rather, Petitioners decided to institute a wholly separate action in this Court.

---

[1] Petitioners contend that they were unable to file their Petition to Compel Arbitration in the Northern District of California because "under the Federal Arbitration Act § 4, a federal court only has authority to compel arbitration in the state where the federal court is located." (Doc. No. 13 at 3 n.3.) Section 4 of the Federal Arbitration Act ("FAA") provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five

6

In the Petition to Compel Arbitration, Petitioners argue that the FA should govern any controversy between Franlogic and Scott Holdings and that under the FA's dispute resolution provision, the parties should proceed to arbitration. (Id. at ¶¶ 21-30.) On December 14, 2016, Respondent Scott Holdings filed a Motion to Dismiss the Petition. (Doc. No. 2.) Petitioners filed a Response in Opposition, and Respondent filed a Reply. (Doc. Nos. 7, 8.) On February 7, 2017, this Court held a hearing on the Petition to Compel Arbitration and the Motion to Dismiss. (Doc. No. 11.) The Court afforded the parties the opportunity to file supplemental briefs. (Doc.

---

days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

9 U.S.C. § 4. Nothing in this Section would have prevented Petitioners from filing their Petition to Compel Arbitration in the Northern District of California.

No. 12.) Thereafter, the parties filed their supplemental briefs on the Motion to Dismiss and the Petition to Compel Arbitration.[2] (Doc. Nos. 13, 14.)

### III. STANDARD OF REVIEW

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, et seq., "establishes a strong federal policy in favor of compelling arbitration over litigation." Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 104 (3d Cir. 2000). Section 2 is the primary substantive provision of the FAA, declaring that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24 (1983) (citing 9 U.S.C. § 2).

Before compelling arbitration, a court must determine: (1) whether a valid agreement to arbitrate exists, and (2) whether the particular dispute falls within the scope of that agreement. Trippe Manufacturing Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005).

### IV. ANALYSIS

Petitioners move to compel arbitration of the action pending in federal court in California. (Doc. No. 1.) In response, Scott Holdings argues that the claims raised in the case filed in California are not subject to arbitration and that the Petition to Compel should be dismissed. (Doc. No. 2-1.) The parties do not contest that there is a valid arbitration clause in the FA. Rather, they only disagree as to whether the dispute at issue falls within the scope of a valid agreement to arbitrate.

---

[2] In reaching a decision, the Court has considered the Petition to Compel Arbitration (Doc. No. 1), Respondent's Motion to Dismiss the Petition to Compel Arbitration (Doc. No. 2), Petitioners' Response in Opposition (Doc. No. 7), Respondent's Reply (Doc. No. 8), oral argument on the Motion to Dismiss (See Doc. No. 11), and the parties' supplemental briefs (Doc. Nos. 13, 14).

### 1. The Dispute in the California Action Does Not Fall Within the Scope of a Valid Agreement to Arbitrate

Petitioners contend that the dispute pending in federal court in California falls within the scope of the FA's arbitration agreement. (Doc. No. 7 at 5.) In contrast, Respondent argues that the dispute does not fall within the scope of the arbitration agreement. (Doc. No. 2-1 at 14-15.) Respondent asserts that the ADA, not the FA, controls the dispute. (Id.) Respondent also maintains that, given the plain reading of the FA, this dispute does not fall within the scope of the FA's arbitration provision. (Id.)

#### a. The Area Development Agreement ("ADA") Controls the Dispute

As noted previously, a court must consider whether the dispute at issue falls within the scope of a valid arbitration agreement. Trippe Manufacturing Co., 401 F.3d at 532. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986). It is the movant's burden to demonstrate that the particular dispute falls within the scope of a valid agreement to arbitrate. Hinnant v. American Ingenuity, LLC, 554 F. Supp. 2d 576, 581 (E.D. Pa. 2008).

Here, Petitioners have not met their burden of showing that the dispute as set forth in the California action falls within the scope of the FA arbitration clause. The ADA controls this dispute, not the FA, because: (1) Scott Holdings sued in California seeking as relief, among other things, rescission of only the ADA, albeit raising other claims not related to the FA, (2) the ADA is the operative agreement, and (3) in the event of any conflict between the ADA and the FA, the ADA controls.

As noted, on July 26, 2016, Scott Holdings initiated an action against Petitioners in California Superior Court. In its Complaint, Scott Holdings alleged that Petitioners violated provisions of the California Franchise Investment Law, engaged in false advertising, and committed unfair trade practices when negotiating with the Scotts to enter into the ADA. (Doc. No. 2-6 at ¶¶ 32-37, 49-64.) Specifically, Scott Holdings alleged that Petitioners made material misrepresentations and induced the Scotts to enter into the ADA, without a full disclosure of the obligations the Scotts would encumber. (Id. at ¶¶ 14-15.) These material misrepresentations include, for example, understating the total fees that Scott Holdings was required to pay to Franlogic in operating the two Scout and Molly's stores under the ADA, understating the total investment Scott Holdings was required to make to open the stores under the ADA, and misstating the historical financial performance of other Scout and Molly's locations. (Id. at ¶¶ 16-19.) Scott Holdings sought relief in the form of rescission of the ADA, restitution, consequential damages, and attorneys' fees. (Id. at ¶ 67.) It also sought a declaration that Petitioners violated provisions of the California Franchise Investment Law and the issuance of an injunction prohibiting Petitioners from "providing false or misleading statements in the sale of franchises in California, or omitting material information required to be disclosed under the law." (Id.) Significantly, Scott Holdings did not seek relief under the FA in the California action, and Scott Holdings did not allege any claim against Petitioners for a violation of the FA. (Id.) From a reading of the Complaint, it is apparent that Scott Holdings is seeking rescission of only the ADA. (Doc. No. 2-5.)

In addition, the ADA is the operative agreement in this case. After reading the ADA and the FA, it is clear that the ADA is the operative agreement establishing the franchisor-franchisee relationship between Franlogic and Scott Holdings. (Doc. No. 14 at 4.) For example, the ADA

gave Scott Holdings the right to establish two Scout and Molly's stores in San Francisco, California. (Doc. No. 2-2 at ¶ 1.) After Scott Holdings and Franlogic entered into the ADA, the parties were required to sign a secondary and separate Franchise Agreement ("FA") for each store that Scott Holdings opened. (Id. at ¶¶ 3-4.) In this sense, the ADA is the operative agreement that established and controlled the franchisor-franchisee relationship, and was the umbrella agreement under which Scott Holdings brought its original action in California.

Finally, the ADA controls in the event that there is any conflict between the ADA and the FA, and therefore this dispute does not fall within the scope of any agreement to arbitrate. As noted earlier, the ADA provides as follows:

> In the event of any conflict between this [Area Development] Agreement and any Franchise Agreement(s), the terms, conditions and intent of this [Area Development] Agreement will control.

(Id. at ¶ 27.) Because the ADA will control in the event that there is any conflict between the ADA and the FA, and given the claims made in the case pending in the Northern District of California, the dispute between the parties does not fall within the scope of any agreement to arbitrate. Thus, Petitioners have not met their burden of demonstrating that this dispute falls within the scope of the arbitration clause in the FA.[3]

For all these reasons, the ADA controls this dispute and the dispute does not fall within the scope of the arbitration provision contained in the FA. Accordingly, the Petition to Compel Arbitration (Doc. No. 1) will be denied, and the Motion to Dismiss (Doc. No. 2) will be granted.

---

[3] Petitioners argue that because one of Respondent's claims for relief in the California case is the return of the $50,000 franchise fee paid under the FA, this dispute falls within the scope of the FA and its arbitration clause. The federal court in California will decide what categories of damages are appropriate if Respondent's claims have been proven. The fact that Respondent seeks return of the $50,000 fee is a matter for the federal court in California to resolve.

### b. The Dispute Does Not Fall Within the Scope of the Arbitration Agreement Contained in the Franchise Agreement ("FA")

Respondent also argues that the plain language of the FA's arbitration clause proves that it does not apply to this dispute. (Doc. No. 8 at 5-7.) As previously explained, a court must consider whether the dispute at issue falls within the scope of a valid arbitration agreement. Trippe Manufacturing Co., 401 F.3d at 532.

Here, as previously noted, the relevant arbitration clause of the FA provides:

21. <u>Governing law; Jurisdiction and Venue.</u>

>  (a) <u>Dispute Resolution</u>.
>
>  (i) Franchisee and Franchisor acknowledge and agree, subject to Section 2l(b),[4] that in the event a dispute between the parties is not resolved informally, an officer of Franchisor and the principal(s) of Franchisee must first meet in King of Prussia, Pennsylvania at the offices of Franchisor or such other place designated by Franchisor to discuss a resolution.
>
>  (ii) In the event the dispute resolution procedures described in Section 21(a)(i)[]result in a settlement between the parties, Franchisor and Franchisee agree that any action arising out of or relating to this Agreement or the making, performance, or interpretation thereof shall upon thirty (30) days written notice by either party be resolved, except as elsewhere expressly provided in this Agreement, upon application by any such party by binding arbitration in Philadelphia, Pennsylvania, in accordance with the Federal Arbitration Act under the Commercial Arbitration Rules then prevailing of the American Arbitration Association, including without limitation the Optional Rules for Emergency Measures

---

[4] Section 21(b) of the FA states as follows:

> (b) <u>Injunctive Relief.</u> Notwithstanding the provisions of Section 21(a), Franchisee agrees that Franchisor, at its option, will have the right to seek preliminary injunctive relief from a court of competent jurisdiction, or in the f:rrst instance from an Arbitrator, to restrain any conduct by Franchisee in the development or operation of the Store that could materially damage the good will associated with the Marks and the Chain. Franchisee agrees Franchisor will not be required to post a bond to obtain any injunctive relief with respect to use of the Marks.

(Doc. No. 2-4 at 9.)

of Protection ("AAA"), and not under any state arbitration laws, and judgment on the arbitration award may be entered in any court of competent jurisdiction.

(Doc. No. 1-1 at ¶ 21(a).) Respondent argues that the language of the FA's arbitration clause shows that it does not apply to this dispute. Petitioners drafted the arbitration clause which reads that "in the event the dispute resolution procedures described in Section 21(a)(1)(i)[ ] result in a settlement between the parties Franchisor and Franchisee agree" to binding arbitration. (Id.) As the plain language currently reads, the FA's arbitration clause does not apply to this case because the parties have not yet reached a settlement. (Doc. No. 2-1 at 14-15.) Petitioners assert that this is a mistake that should be reformed. (Doc. No. 13 at 8.) However, as the movants requesting that the Court compel arbitration, Petitioners have not yet met their burden of demonstrating that this dispute falls within the scope of the FA's arbitration clause, either as it now reads or even if it is somehow reformed.[5] Consequently, for this additional reason, the Petition to Compel (Doc. No. 1) will be denied, and the Motion to Dismiss (Doc. No. 2) will be granted.

---

[5] Petitioners seek to reform the arbitration clause in the FA because they allege that the word "no" is missing from this provision. (Doc. No. 13 at 8-9.) Petitioners contend that the Court should reform the language of the arbitration clause to correct this mistake. (Id.) However, under Pennsylvania law, a mistake "must be mutual in order to open the door to reformation or avoidance of the contract." Harrison v. Fred S. James, P.A., Inc., 558 F. Supp. 438, 443 n.3 (E.D. Pa. 1983) (citing Central Transportation, Inc. v. Board of Assessment Appeals, 417 A.2d 144, 148 (Pa. 1980)). The party seeking reformation is required to show by clear and convincing evidence that the mistake was mutually made by both contracting parties. Butcher v. General Motors Co., No. 14-0353, 2015 WL 867797, at *3 (W.D. Pa. Feb. 27, 2015) (citing Holmes v. Lankenau Hosp., 627 A.2d 763, 767-68 (Pa. 1993)). Respondent disputes that the FA language concerning the alleged missing "no" is inaccurate. Therefore, there was no meeting of the minds to create a mutual mistake. Since the lawsuit was brought in California alleging violations of the California Franchise Investment Law, false advertising, and unfair competition, which induced Respondent to enter into the ADA, this Court will not engage in any fact finding regarding whether the FA's arbitration clause should be reformed but will defer to the district court in California, if deemed necessary by that court.

## V. CONCLUSION

For the foregoing reasons, the Petition to Compel Arbitration (Doc. No. 1.) will be denied and Respondent's Motions to Dismiss (Doc. No. 2) will be granted. An appropriate Order follows.